**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

**Gabriel S. Fernandez,**

**Plaintiff,**

**v.**                                                    **Case No. 22-cv-2282-JWL**

**Sugar Creek Packing Co.,**

**Defendant.**

**MEMORANDUM & ORDER**

Plaintiff Gabriel S. Fernandez filed this lawsuit against defendant, his former employer, asserting that defendant terminated his employment based on his race in violation of 42 U.S.C. § 1981 and in violation of Kansas public policy.  This matter is presently before the court on defendant's motion for summary judgment on both claims (doc. 38).  As explained below, the motion is granted.

**I.      Facts**

The following facts are uncontroverted, stipulated in the pretrial order, or related in the light most favorable to plaintiff as the nonmoving party.  Defendant Sugar Creek Packing Company manufactures raw and fully cooked food products.  Defendant's Frontenac, Kansas plant processes raw bacon, cooked bacon, bacon bits, pizza toppings and bacon jerky.  Plaintiff, who is Hispanic, began working for defendant at its Frontenac, Kansas plant in December 2010 as a Maintenance Technician.  In that role, plaintiff was responsible for managing equipment conditions and work orders; preventative maintenance; identifying and managing safety issues

relating to production processes; assisting the production staff with attaining production, safety and quality goals; and identifying and resolving problems in production processes. In June 2013, defendant promoted plaintiff to Lead Maintenance Technician. Plaintiff's job responsibilities in this role were largely the same. In August 2015, defendant promoted plaintiff to Maintenance Supervisor. In this role, plaintiff was responsible for supervising and coordinating the day-to-day activities of the Maintenance Technicians and assisting in maintaining and repairing production and facility equipment. It is uncontroverted that plaintiff's job responsibilities have always included identifying, addressing and remedying safety concerns regarding defendant's equipment.[1]

As a Maintenance Supervisor, plaintiff reported directly to Eddie Collins, the Maintenance Manager at the plant. Mr. Collins, in turn, reported directly to the Plant Manager. Andrew Alexander was the Plant Manager in 2020 and Derek Boesken was the Plant Manager in 2021. Mssrs. Alexander and Boesken both served as the Plant's Operation Manager in the year prior to working as the Plant Manager. The record reflects that Mr. Alexander became the Plant Manager at one of defendant's plants in Indiana on January 1, 2021.

In January 2021, one of defendant's employees informed Mr. Collins that a local pawn shop was selling equipment that appeared to belong to defendant—specifically, a Cannon industrial fan and a Miller welding cooler. That employee provided photographs to Mr. Collins of the equipment displayed at the pawn shop. Mr. Collins then informed Mr. Boesken about the

---

[1] Plaintiff purports to controvert this fact by stating only that management "ignored safety concerns regarding defendant's equipment causing injuries." This statement does not controvert the fact set forth by defendant.

pawn shop matter and forwarded the photographs to him.  Mr. Boesken, in turn, notified his direct supervisor at defendant's corporate office and defendant commenced an investigation.  Greg Thomson, defendant's Director of Human Resources, conducted the investigation.  As part of that investigation, Mr. Thomson directed Mr. Boesken to go to the pawn shop himself to verify what, if any, equipment was at the shop.

Mr. Boesken and Mr. Collins went to the pawn shop.  Mr. Boesken testified that he observed "a significant amount of equipment" that he believed belonged to defendant.  When Mr. Boesken asked the pawn shop owner who had brought the equipment to the pawn shop to sell, the owner indicated that plaintiff had brought the equipment in and that it was not the first time he had done so.  Plaintiff received $800.00 from the pawn shop for the equipment.  Mr. Thomson then interviewed plaintiff, Mr. Collins, Mr. Boesken and Mr. Alexander.[2]  Plaintiff admitted taking the items and selling them to the pawn shop, but he insisted to Mr. Thomson that he had obtained verbal permission to do so from Mr. Collins and that the items were removed from defendant's trash and recycling dumpsters.  Mr. Collins, however, denied giving permission to plaintiff to remove these items.  Mr. Boesken and Mr. Alexander also denied giving permission to plaintiff to take the items that were sold to the pawn shop.  Plaintiff was unable to provide Mr.

---

[2] Curiously, plaintiff states in his affidavit (which, without objection by defendant, has not been signed by plaintiff) that he was never interviewed by defendant as part of its investigation.  But plaintiff clearly testified in his earlier deposition that he told Mr. Thomson during the investigation that he had permission to take the items and he remembers being told during the investigation that Mr. Alexander and Mr. Collins had denied giving him permission.  He also recalled asking Mr. Thomson to commence an investigation against Mr. Alexander and Mr. Collins.  See Doc. 42-2, p. 118.  The court, then, rejects this portion of plaintiff's affidavit.  *See Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014) (affidavit may be rejected when it is plainly inconsistent with earlier deposition testimony).

Thomson with any documentation evidencing permission to take the items.  As a result of this investigation, defendant terminated plaintiff's employment on January 29, 2021.  The termination decision was made by Mr. Thomson in consultation with defendant's Chairman of the Board; defendant's President; defendant's Chief Operations Officer; defendant's General Counsel; defendant's Director of Compliance; and Mr. Boesken.

The record reflects that plaintiff and other employees sometimes sought (either verbally or through text messages) and obtained permission to take items from defendant's trash dumpster and recycling dumpster.  Mr. Alexander, for example, testified that he recalled plaintiff asking him on one occasion if he could take a few pieces of scrap sheet metal to repair the roof at his residence and Mr. Alexander gave him permission to do so.  There is evidence that, on another occasion, plaintiff asked Mr. Alexander via text message whether he could take some metal and a couple of pipes out of defendant's dumpster.  Mr. Alexander asked plaintiff to send him a photo of the items and approved the request.  Similarly, there is evidence that Mr. Collins authorized plaintiff, on occasion, to remove items from defendant's dumpsters for a particular use.  The evidence also demonstrates that Mr. Alexander frequently gave large, discarded barrel drums to employees.  On another occasion, Mr. Alexander gave out fans to a number of employees, including plaintiff, when the plant replaced its old fans with stainless steel fans.  There is no evidence, and plaintiff does not suggest, that employees were allowed to take items from defendant's property without authorization.[3]

---

[3] In his affidavit, plaintiff summarily avers that he received permission from Mssrs. Alexander, Collins and Boesken "to take possession of items which the company had chosen to discard." Plaintiff does not suggest in his affidavit or in his submissions that defendant or these individuals had given him blanket authorization to take discarded items at any time.  And with respect to Mr.

With respect to the Miller welding cooler and the Cannon industrial fan identified by defendant at the pawn shop, plaintiff testified that Mr. Collins had given him verbal permission to take the welding cooler out of the dumpster in November 2020. According to plaintiff, he then placed the cooler for sale on Facebook Marketplace. Thereafter, another employee saw the posting, notified Mr. Collins, and Mr. Collins directed plaintiff to remove the posting. Plaintiff testified that Mr. Collins told him that if Mr. Alexander discovered that plaintiff was selling company property online, plaintiff would "probably" be fired. Mr. Collins also told plaintiff to remove a posting for chairs that he was selling that he had made out of discarded wood from defendant's plant. Mr. Collins denied ever giving permission for plaintiff to take the welding cooler. And there is no evidence or argument that plaintiff ever received permission to take the Cannon industrial fan. Mr. Collins acknowledged in his deposition that Cannon industrial fans were sometimes placed in defendant's recycling dumpster for repurposing.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.    Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving

---

Boesken, there is no evidence that plaintiff ever sought or received permission to obtain any specific item. Plaintiff suggests that Mr. Boesken testified that plaintiff frequently texted him asking permission to take various items, but Mr. Boesken testified only that plaintiff, during the investigation into the pawn shop matter, texted him numerous times to assert that he had obtained permission to take the items that were found there.

party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a).  A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted).  "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

## III.     Race Discrimination Claim

In the pretrial order, plaintiff asserts that defendant terminated his employment based on plaintiff's race in violation of 42 U.S.C. § 1981.  Plaintiff concedes that he has no direct evidence of discrimination, and his claim is therefore analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012).[4]  Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id.*  To set forth a prima facie case of discrimination, plaintiff must establish "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Id.* (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)).  If he

---

[4] In race discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under § 1981 or Title VII. *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1168 (10th Cir. 2018) (citations and quotations omitted).

establishes a prima facie case, the burden shifts to defendant to assert a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If defendant meets this burden, summary judgment against plaintiff is warranted unless he introduces evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id.* (citing *Simmons v. Sykes Enters.*, 647 F.3d 943, 947 (10th Cir. 2011)).

In its motion for summary judgment, defendant asserts that plaintiff cannot establish the third element of his prima facie case of discrimination and, in any event, cannot establish that defendant's proffered reason for the termination decision is pretextual. Although defendant contends that plaintiff's prima facie case fails because he has not come forward with evidence that his termination took place under circumstances giving rise to an inference of discrimination, plaintiff contends, and the court agrees, that defendant's arguments on this point are more appropriately analyzed at the pretext stage. *See Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 884 (10th Cir. 2018) (explaining that the purpose of the prima facie case is to exclude "the two most common, legitimate reasons for termination, *i.e.*, lack of qualification or the elimination of the job").

The court turns, then, to whether defendant has met its burden to articulate a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that defendant has carried it here. *See id.* According to defendant, it terminated plaintiff's employment after its internal investigation revealed that

plaintiff had taken property from defendant without permission and sold it to a local pawn shop. The burden of proof, then, shifts back to plaintiff to show that defendant's proffered reason is pretextual.

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (citations and quotations omitted). A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently. *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011). In essence, a plaintiff shows pretext by presenting evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Dewitt*, 845 F.3d at 1307 (citations and quotations omitted).

Plaintiff's evidence, viewed in combination and in the light most favorable to him, is insufficient to cast doubt on defendant's proffered reason for terminating plaintiff's employment. In an effort to establish pretext, plaintiff primarily urges that he had permission from Mr. Collins to take the welding cooler.[5] It is unconverted that defendant knew that plaintiff claimed that he

_____

[5] Plaintiff testified that Mr. Collins acknowledged to plaintiff that he had given him permission to take the cooler when Mr. Collins told him to remove the posting from Facebook Marketplace. This testimony, however, does not help plaintiff's case. The testimony does not demonstrate that a decisionmaker knew that Mr. Collins had given permission to plaintiff to take the cooler.

had permission from Mr. Collins to take the welding cooler.  But Mr. Collins denied this fact to Mr. Thomson during the investigation and it is uncontroverted that defendant believed Mr. Collins.  Even if defendant was mistaken in its assessment of what happened, plaintiff presents no evidence suggesting that defendant did not honestly believe that Mr. Collins had not given permission to plaintiff to take the cooler.  *See Rutledge v. Bd. of Cnty. Commissioners of Johnson Cnty., Kansas*, No. 22-3081, 2023 WL 4618335, at *6 (10th Cir. July 19, 2023) (citing *Est. of Bassatt v. Sch. Dist. No. 1*, 775 F.3d 1233, 1240 (10th Cir. 2014) (holding that employer's "decision to believe [one employee] over [another], when there was no direct evidence either way, is not evidence of pretext"); *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) ("Perhaps a reasonable factfinder could observe all the witnesses and believe [p]laintiff's version of the events . . . [, but] that is not the issue.")).

In other words, the pertinent issue is not whether plaintiff in fact had permission from Mr. Collins to take the cooler but whether the people who made the termination decision (a group that did not include Mr. Collins) believed that plaintiff had permission to take it.  *See Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1261 (10th Cir. 2001) ("When assessing a contention of pretext, we examine the facts 'as they appear to the person making the decision to terminate [the] plaintiff.'" (quoting *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1231 (10th Cir. 2000)).   Plaintiff offers no evidence that the decisionmakers believed anything other than that Mr. Collins never gave plaintiff permission to take the cooler or any other item that plaintiff sold to the pawn shop. Thus, even assuming plaintiff had permission from Mr. Collins to take the

_____

Moreover, the testimony indicates that Mr. Collins had cautioned plaintiff that he would likely be terminated if upper management discovered he was selling company property.

cooler, that evidence does not create a jury question on defendant's proffered reason for terminating plaintiff's employment. *See Rutledge*, 2023 WL 4618335, at *6 (plaintiff who told his employer that his manager had given him permission to sit in the breakroom for an hour after clocking in did not establish pretext where there was no evidence that employer believed that manager had given him permission to do so).

Moreover, plaintiff does not contend that he had permission to take the industrial fan and he does not contend that he had permission from anyone to sell anything to the pawn shop. Thus, while plaintiff highlights that he had obtained permission from Mr. Collins and other managers to take items on other occasions for specific reasons such as repairing his own residence and repairing other items in defendant's plant, this evidence does not cast doubt on the fact that defendant terminated plaintiff's employment because he had taken these specific items from defendant without permission *and sold them to a pawn shop*. Similarly, plaintiff makes much of the fact that defendant never contacted the police, did not attempt to pursue criminal charges against plaintiff, and did not ask the pawn shop to return the items that plaintiff had sold to it. But these facts are simply not relevant to the question of whether defendant actually believed that plaintiff took the items without permission and sold them to the pawn shop and terminated his employment based on that belief.

In a further effort to show pretext, plaintiff asserts that Mr. Alexander had a "vendetta" against him. Specifically, plaintiff testified that he made Mr. Alexander "look bad to corporate" on one occasion in 2018. Significantly, he does not allege that this vendetta was based on plaintiff's race or ethnicity or that Mr. Alexander otherwise exhibited any race-based bias toward plaintiff or any other Hispanic person. *See Markley v. U.S. Bank National Ass'n*, 59 F.4th 1072,

1086 (10th Cir. 2023) (where plaintiff "offered zero evidence" that his supervisor harbored any age-based bias, plaintiff could not rely upon the cat's-paw or rubber-stamp theory to show that supervisor improperly tainted investigation).  In any event, even assuming that Mr. Alexander, as argued by plaintiff, held a personal vendetta against plaintiff, this evidence fails to create a material factual dispute about the reason for plaintiff's termination because there is no evidence that Mr. Alexander participated in the decision to terminate plaintiff's employment, recommended that defendant terminate plaintiff's employment, or influenced that decision in any way.  Rather, the evidence reflects only that Mr. Thomson contacted Mr. Alexander (who was no longer working at the Frontenac plant) during the course of his investigation into the pawn shop matter to inquire whether Mr. Alexander had given plaintiff permission to take the items that were discovered at the pawn shop.  The uncontroverted evidence shows that Mr. Alexander told Mr. Thomson that he had given permission to plaintiff to take "a couple of pieces of sheet metal" on one occasion but that he did not recall giving permission to take anything else.[6]  Mr. Alexander testified that he participated in this "quick" phone call with Mr. Thomson and was "uninvolved" in the process after that discussion.[7]  Thus, Mr. Alexander plainly had no input or influence on the decision to terminate plaintiff.

Plaintiff also contends that similarly situated Caucasian employees were treated more favorably than him.  Specifically, he avers that Chris Payne and Sam McCabe "obtained items"

---

[6] Plaintiff does not contend that he had permission from Mr. Alexander to take the items he sold to the pawn shop; he contends only that Mr. Collins had giving him permission.  In other words, plaintiff does not suggest that Mr. Alexander was dishonest in his statements to Mr. Thomson.

[7] Plaintiff asserts in his submissions that Mr. Alexander "participated in a call about plaintiff being discharged."  Doc. 42, p. 11.  The citation provided by plaintiff in support of that assertion does not support the assertion.

from defendant but were not terminated.  This assertion misses the point.  Defendant does not contend that it terminated plaintiff's employment because he obtained items from defendant, but because he did so without permission and then sold those items to a pawn shop.  There is no evidence, and plaintiff does not suggest, that Mr. Payne or Mr. McCabe obtained items from defendant without permission or that they sold items obtained from defendant to a pawn shop.  As such, they are not similarly situated to plaintiff for purposes of establishing pretext.  *See Smothers v. Solvay Chemicals, Inc.,* 740 F.3d 530, 541-42 (10th Cir. 2014) (similarly situated employees must have engaged in conduct of comparable seriousness).  Plaintiff's purported comparison, then, is not evidence of pretext.

Plaintiff also contends that defendant's progressive discipline policy entitled him to a warning prior to termination and that defendant's failure to provide him with a warning consistent with that purported policy is evidence of pretext.  But the record does not contain any written progressive discipline policy whatsoever and the evidence referenced by plaintiff—excerpts from the depositions of Mr. Collins and Mr. Alexander—demonstrates that defendant did not require any particular steps prior to termination and that supervisors had discretion with respect to discipline depending on the particular infraction.  *See Lobato v. New Mexico Environment Dept*., 733 F.3d 1283, 1291 (10th Cir. 2013) (where evidence shows only that progressive discipline is discretionary and employer did not ignore an established policy in its choice of sanction, failure to implement progressive discipline is not evidence of pretext) (citations and quotations omitted); *Antonio v. Sygma Network, Inc*., 458 F.3d 1177, 1182 (10th Cir. 2006) (no inference of retaliatory motive arises from defendant's failure to utilize progressive discipline prior to terminating plaintiff; employee handbook made progressive discipline discretionary).

Lastly, plaintiff points to alleged flaws in defendant's investigation into the pawn shop matter. In his submissions, plaintiff highlights that Mr. Thomson never "looked into text messages from plaintiff" during the investigation. It is uncontroverted, however, that no text messages exist supporting plaintiff's claim to Mr. Thomson that he had obtained verbal permission from Mr. Collins to take the items that he sold to the pawn shop. The fact that Mr. Thomson never looked for such messages, then, had no bearing on the results of his investigation. *Conroy v. Vilsack*, 707 F.3d 1163, 1176 (10th Cir. 2013) (for an inference of pretext to arise based on a procedural irregularity or flawed investigation, there must be some evidence that the irregularity directly and uniquely disadvantaged the plaintiff). Plaintiff further asserts that Mr. Boesken did not interview plaintiff before the termination of plaintiff's employment and that Mr. Collins did not "reach out" to plaintiff before the termination of plaintiff's employment. He argues that Mr. Collins and Mr. Boesken spent just 10 minutes at the pawn shop, did not take any notes during their conversation with the shop owner, and never asked the shop owner for a written statement. Plaintiff, however, fails to explain the significance of these points. It is uncontroverted that Mr. Thomson interviewed plaintiff during the investigation and understood plaintiff's assertion that he had obtained permission to take the items discovered at the pawn shop. Plaintiff does not identify any disadvantage or other flaw stemming from the duration of time that Mssrs. Collins and Boesken spent in the pawn shop or from their failure to take notes or acquire a written statement from the shop owner. Because plaintiff has not identified a deficiency in defendant's investigation that had any bearing on the result of that investigation, these purported deficiencies cannot establish pretext. *See Markley v. U.S. Bank National Ass'n*, 59 F.4th 1072 (10th Cir. 2023) ("not every

imperfect or errant action by an employer" during an investigation will satisfy a plaintiff's pretext burden).

While the court here has addressed plaintiff's arguments sequentially for ease of analysis, the court emphasizes that it has considered plaintiff's evidence in its totality and finds that evidence, taken as a whole, insufficient to permit an inference of pretext. *See Bekkem v. Wilkie*, 915 F.3d 1258, 1270–71 (10th Cir. 2019). For even considering the totality of plaintiff's evidence, that evidence does not demonstrate that defendant's asserted reason for plaintiff's termination is "so weak, implausible, inconsistent, incoherent, or contradictory" as to support a reasonable inference that defendant did not act for that asserted reason. *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007). Stated another way, plaintiff's evidence is insufficient for a reasonable jury to find that defendant's proffered justification was not the real reason for plaintiff's termination. Plaintiff, then, has failed to meet his burden of demonstrating pretext and summary judgment in favor of defendant is warranted.

**Retaliatory Discharge in Violation of Public Policy**

Plaintiff also asserts in the pretrial order that defendant terminated his employment because he objected to various safety violations over the course of his employment. The Kansas Supreme Court has recognized the tort of retaliatory discharge as a public policy exception to the employment-at-will doctrine. *See Palmer v. Brown*, 242 Kan. 893, 896 (1988). As the Court noted in *Palmer*:

> Public policy requires that citizens in a democracy be protected from reprisals for performing their civil duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare. Thus, we have no

> hesitation in holding termination of an employee in retaliation for the good faith
> reporting of a serious infraction of such rules, regulations, or the law by a co-worker
> or an employer to either company management or law enforcement officials
> (whistle-blowing) is an actionable tort.

*Id.* at 900. To establish this claim, a plaintiff has the burden of proving by clear and convincing evidence, under the facts of the case, that a reasonably prudent person would have concluded the plaintiff's employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; that the employer had knowledge of the plaintiff's reporting of such violation prior to discharge of the plaintiff; and that a causal connection exists between the report and the plaintiff's discharge. *Id.*; *Poull v. Affinitas Kansas, Inc.*, 2010 WL 1462763, at *7 (Kan. App. Apr. 8, 2010). If the plaintiff establishes a prima facie case, the defendant then bears the burden of producing evidence that the plaintiff was terminated for a legitimate nonretaliatory reason. The burden then shifts back to the plaintiff to show that the defendant's reasons are pretextual. *Goodman v. Wesley Medical Center, LLC*, 276 Kan. 586, 590 (2003).

Defendants move for summary judgment on this claim on the grounds that plaintiff cannot establish a prima facie case of retaliatory discharge. Specifically, defendant contends that plaintiff has not come forward with sufficient evidence from which a reasonable jury could conclude that defendant had knowledge that plaintiff was "whistleblowing" as opposed to merely performing the job he was assigned to do—to notify defendant about any safety issues he observed and to address and remedy those issues. Defendant also contends that no reasonable jury could conclude that a causal connection exists between plaintiff's reports and the decision to terminate plaintiff's employment. The court grants summary judgment on this claim because no reasonable jury could

find a causal connection between plaintiff's reports and defendant's decision to terminate his employment.

The court begins with defendant's argument that plaintiff cannot establish that defendant knew that plaintiff was reporting safety issues as a "whistleblower." The court declines to address the merits of this argument. While defendant initially frames its argument as a factual one (whether defendant had knowledge that plaintiff was acting as a whistleblower), the substance of defendant's argument is really a legal one. According to defendant, Kansas law does not extend whistleblower protection to individuals whose job responsibilities require them to raise the concerns that they raised. But on this point, defendant directs the court to no Kansas cases addressing this argument or any cases from other jurisdictions that might provide guidance. The court's own research reveals that the Kansas Supreme Court has not discussed (much less recognized) a "job-duties exception" to the rule announced in *Palmer v. Brown*. While that exception exists in the context of the False Claims Act, *see Adler v. Continental Ins. Co*., 1996 WL 677085, at *4 (D. Kan. Nov. 1, 1996) (False Claims Act generally "does not protect activities that are within the scope of an employee's job responsibilities"), the court has not uncovered any case importing that rule to a public policy retaliation claim under Kansas law. *See Berkemeier v. Standard Beverage Corp.,* 171 F. Supp. 3d 1122, 1144 (D. Kan. 2016) (where defendant relied only on *Adler v. Continental Insurance Company* to support argument that public policy retaliation claim failed because the plaintiff's reports were part of her job description, court declined to apply that exception in the absence of any Kansas case applying a corollary rule to whistleblower retaliation claims). Moreover, plaintiff himself has not addressed this issue in any

respect.  Because the issue raised by defendant has not been fully developed and involves the interpretation of state law, the court declines to reach it here.

Nonetheless, summary judgment in favor of defendant is warranted on this claim.  The evidence reflects that plaintiff's most recent safety reports occurred in August 2020, approximately five months prior to the termination of his employment in January 2021.  Kansas cases "confirm that this length of time is too long to support an inference of causation or retaliatory motive on its own."  *Shoemaker v. Plastic Packaging Techs., LLC*, 2019 WL 2553935, at *3-4 (Kan. Ct. App. 2019) (collecting cases from Kansas and the Tenth Circuit holding that any gap longer than roughly two-and-a-half months is too long to prove causation).  Plaintiff, then, must present additional evidence of circumstances that justify an inference of retaliatory motive. He has not presented any such evidence.

As articulated in his brief, plaintiff's argument is essentially that because he "continuously brought up safety concerns" in the workplace and was later terminated, there must be some causal relationship between those two things.  It is uncontroverted, however, that plaintiff's job required him to notify defendant of any safety issues he observed, including each of the safety issues he relies on his support of his whistleblower claim.  It is also uncontroverted that plaintiff's job required him to address and remedy any safety issues he observed, including each of the safety issues he relies on his support of his claim.  The parties have stipulated in the pretrial order that plaintiff was responsible for identifying and remedying safety issues. In light of plaintiff's job responsibilities, it is not at all surprising that plaintiff, as admitted by Mr. Alexander, was "vocal" about safety issues.  But contrary to plaintiff's suggestion, there is no evidence that Mr. Alexander or anyone else in management (and, more importantly, any of the decisionmakers in this case)

was concerned or upset that plaintiff continued to raise safety concerns.  In fact, in the deposition excerpt relied upon by plaintiff, Mr. Alexander explained:  "We wanted him to be vocal about safety issues and we wanted him to bring them up as part of his job duties."  In a similar vein, plaintiff asserts that Mr. Boesken "was involved with the plaintiff on safety issues."  This is not contested by defendant.  Mr. Boesken testified that plaintiff "brought up safety concerns from the production floor" and that those concerns were discussed in meetings, after which work orders were put in place to correct the concerns.[8]

In short, plaintiff points to no evidence suggesting that defendant terminated plaintiff's employment based on the fact that he was vocal about safety issues or based on the fact that he continuously raised safety concerns in the workplace.  There is no evidence that defendant was tired of receiving plaintiff's reports, upset about those reports, or in any way concerned about the number or nature of the reports that plaintiff raised.  Rather, the record reflects only that plaintiff continuously raised such concerns (as he was hired to do) and that defendant never reprimanded plaintiff or otherwise disciplined plaintiff for doing so.  For the foregoing reasons, plaintiff cannot establish a causal connection between his reports about safety issues in the workplace and the termination of his employment five months later.  Defendant's motion for summary judgment on this claim is granted.

---

[8] The record reflects that plaintiff, as part of his job duties, discussed safety issues regularly with Mr. Alexander, Mr. Collins and Miles Owens, defendant's Safety Manager.  None of these individuals participated in the decision to terminate plaintiff's employment and, in any event, there is no evidence that any of these individuals bore any retaliatory bias toward plaintiff based on his reports or discussed these reports with any decisionmakers. *See Palmer v. Brown*, 242 Kan. 893, 900 (1988) (plaintiff must show that decisionmaker had knowledge of report prior to discharge of employee).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 38) is granted.

**IT IS SO ORDERED.**

Dated this 8th day of August, 2023, at Kansas City, Kansas.

s/John W. Lungstrum
John W. Lungstrum
United States District Judge